Filed 9/1/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUNGHO PARK, | B260047 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC546792) |
| v. | |
| BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY, | MODIFICATION ORDER [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT*:

It is ordered that the electronic copy of this opinion, filed August 27, 2015, is modified to conform to the official paper copy filed on that date.

Footnote 1 on page 1 of the Dissent will now read:

"[1]I recognize that in applying the anti-SLAPP statute in the analogous context of a hospital staff termination proceeding, *Nesson v. Northern Inyo County Local Hospital District* (2012) 204 Cal.App.4th 65, 83, disapproved on another ground in *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 686, fn. 18, the court stated that the hospital based its decision on letters and a report from a hospital committee, and these

"are part of the peer review process."  To the degree this is a holding that the hospital decision itself arises from such communications and is sufficient to invoke the statute, I disagree."

Following the text and above the footnote should be inserted:  "EPSTEIN, P. J."

There is no change in judgment.

_____

\*EPSTEIN, P. J.                              MANELLA, J.

Filed 8/27/15 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SUNGHO PARK, | B260047 |
| Plaintiff and Respondent, | (Los Angeles County<br>Super. Ct. No. BC546792) |
| v. | |
| BOARD OF TRUSTEES OF THE<br>CALIFORNIA STATE UNIVERSITY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Richard Edward Rico, Judge. Reversed and remanded with directions.

Siegel & Yee, Jane E. Brunner and Alan S. Yee for Plaintiff and Respondent.

Towle, Denison, Smith & Maniscalco, Michael C. Denison for Defendant and Appellant.

**INTRODUCTION**

Plaintiff Sungho Park sued his former employer, defendant Board of Trustees of the California State University (CSU), alleging that CSU discriminated against him based on his national origin when it denied his application for a tenured faculty position and consequently terminated him. Park's complaint sought damages and an injunction awarding him a tenured position. CSU moved to strike the complaint under Code of Civil Procedure section 425.16, the anti-SLAPP statute.[1] The trial court denied the motion, concluding that Park's claims did not arise from CSU's communicative conduct related to the tenure review process, but rather from its allegedly discriminatory denial of tenure. Under the circumstances presented here, we conclude the gravamen of the complaint arises from protected activity and therefore reverse and remand with directions to the trial court to determine whether Park demonstrated a reasonable probability of prevailing on the merits of his claims.

**FACTUAL AND PROCEDURAL HISTORY**

*A.    Park's Complaint*

Park filed a verified complaint on May 27, 2014 alleging two causes of action against CSU for discrimination based on national origin and failure to prevent discrimination and seeking damages and injunctive relief to "restore his rights and privileges as a tenured professor." Park alleged he was hired by CSU in 2007 as an Assistant Professor in the Charter College of Education, Division of Special Education and Counseling, at California State University, Los Angeles (Cal State LA). CSU is a state public entity that owns and operates Cal State LA. Park was hired as a tenure-track faculty member; his duties included teaching credential and graduate programs, coordinating a disabilities credential program, researching and publishing, participating in committees, presenting at conferences, and working with local community groups.

---

[1]    SLAPP is an acronym for Strategic Lawsuit Against Public Participation. All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Park, whose national origin is Korean, specialized in "studying Korean parents' views of special education."

Park applied for tenure at Cal State LA in January 2013. CSU denied his application in May 2013. According to Park, CSU "justif[ied] its decision with ambiguous allegations that Park's performance in the area of professional achievement was unsatisfactory based on his failure to publish enough papers, while awarding tenure to Caucasian faculty with the same or fewer number of publications." In fact, he alleged, the denial of tenure to Park was "motivated by prejudice" based on his national origin.

Specifically, Park claimed he "met or exceeded the requirements under CSU policies for promotion to the rank of Associate Professor," a tenured position. Under CSU's policies and procedures for faculty retention, tenure or promotion (RTP), a faculty member is evaluated in three categories: (1) educational performance; (2) professional achievement; and (3) contributions to the university. The policy provides that "in all categories, emphasis shall be placed on quality and effectiveness, and not only on quantity of performance." Park was rated as satisfactory in the first and third categories, but was denied tenure based on his rating in professional achievement. Park complains that he was "only credited with having published two papers when he actually published four." He also alleges that at least three Caucasian faculty members in his division received tenure with "a publication record similar to or inferior to his." He contends that he was "criticized" for publishing in certain journals and for publishing in the last two years before seeking tenure, but that Caucasian colleagues did not receive the same criticism for the same conduct. Park further alleged that he was "not given credit" for other professional activities that should have counted toward his professional achievement rating.

During the course of his employment at CSU, Park alleged that Diane Fazzi, Dean and former Chair of the Charter College of Education, "made comments to Park and behaved in a manner that reflected prejudice against him on the basis of his national origin." Fazzi allegedly "criticized Park for not handling his students well," and suggested it was due to Park's "cultural background and language."

Park filed a grievance challenging the denial of tenure pursuant to CSU's Collective Bargaining Agreement (CBA). Following a grievance hearing, CSU "denied his grievance on the basis that his performance was found unsatisfactory in the area of professional achievement."

B.    *CSU's Anti-SLAPP Motion*

      *1. CSU's Motion and Supporting Evidence*

CSU moved to strike Park's complaint pursuant to section 425.16, arguing that the complaint was "based on alleged discriminatory communicative acts of [CSU] within the [RTP] process of [Cal State LA], the subsequent grievance process, and alleged statements of Cal State LA personnel related thereto."[2]

In support of its motion, CSU presented the declaration of Dr. Philip LaPolt, Associate Vice President for Research and Academic Personnel at Cal State LA, discussing the general retention, tenure and promotion (RTP) process and the specific reviews provided to Park. CSU also provided excerpts from its policies regarding the RTP process and documents from Park's personnel file, including performance reviews and RTP recommendations from 2008 through 2013, the letter from the university president in 2013 ultimately denying Park's tenure application, and the Grievance Report denying Park's grievance.

These materials provided additional pertinent details regarding the RTP process. CSU's written personnel policies provide for the evaluation of faculty using the following evaluative terms: "Outstanding, Commendable, Satisfactory, Needs Improvement, and Unsatisfactory." "To receive a favorable recommendation for tenure and promotion at least satisfactory performance must be demonstrated in all three categories;" conversely, a rating of unsatisfactory in any category "shall entail a negative recommendation for retention, tenure, or promotion." At the time of candidacy for tenure, "a faculty member

---

[2]    The parties also addressed the second prong of the anti-SLAPP analysis, the probability of Park's prevailing on the merits of his claim. Because we remand this matter to allow the trial court to address the second prong, we have omitted details relevant to only that issue from our discussion here.

4

is expected to have demonstrated substantive achievements in each of the three areas; promise of future growth will not be sufficient to warrant a positive recommendation." The written policies and procedures for Charter College list five categories within the area of professional achievement, labeled B1 through B5.[3] The policies provide that the evaluation of professional achievement "will be concentrated across a number of different indicators" from at least two categories: one must be either B1, B2, or B3, and the second may be any other category from B1 to B5.

Probationary faculty typically are considered for tenure during their sixth probationary year. The review process is conducted at multiple levels within the university, beginning with the Department Personnel Committee and proceeding upward to the chair of the department, the dean, the provost and vice president of academic affairs, and the university president. At each level, the reviewer makes a written recommendation whether to grant tenure and that recommendation is provided to the candidate. A faculty member who is not granted tenure receives a "final termination year" of employment.

The review forms from Park's file consistently include comments from reviewers noting Park's lack of publications and urging him to "concentrate his efforts" in that area. For example, in June 2008, the department chair's recommendation noted that Park had not "published or submitted any manuscript during this review period," and recommended that he "focus on completing his in-preparation manuscripts for publication."[4] In the following review, in November 2008, the department chair rated Park "satisfactory" in professional achievement, but cautioned him to "focus on completing his in-preparation manuscripts for publication in order to have a future positive evaluation in this area." In 2010, the Department Personnel Committee rated

---

[3] The categories are as follows: B1 (publications), B2 (college and community-based projects), B3 (grants), B4 (presentations), and B5 (other contributions to professional achievement).

[4] The other levels of review each year contained very similar comments regarding Park's publication record.

Park as "Needs Improvement" in the category of professional achievement and stated it was "concerned about the apparent lack of progress in moving his work into publication." Park's 2011 review from the Charter College Dean stated that "Park has received feedback from all levels of the RTP process in the past several years, to increase and improve his contributions to the area of professional achievement. His contributions have not improved and I have substantial concerns that he does not have sufficient time to publish his work in professional journals in time for consideration for tenure." In 2012, the dean again noted that Park's contributions in the area of professional achievement had "not improved significantly" and repeated her concerns regarding publication and tenure. The dean thus found Park's "contributions in the area of Professional Achievement to be needing improvement. . . . [A]s of this review he has not had a single publication in a referred journal since joining the faculty." In 2013, Park was rated "unsatisfactory" at each review level in the area of professional achievement. In a letter dated May 31, 2013, President James Rosser informed Park that "[a]fter reviewing your personnel file and the recommendations . . . you will not be awarded tenure or promotion and 2013-2014 will be your terminal year. . . . This decision is based on your performance in the area of professional achievement, which is judged to be unsatisfactory."

In the Grievance Report dated September 27, 2013, Dr. LaPolt summarized the hearing regarding Park's grievance, which the report described as "based on the allegation that Dr. Park was not evaluated in a 'fair, thorough and consistent' manner, depriving him of tenure in violation of the CBA." The report concluded that Park "has failed to demonstrate" that the University violated the CBA and dismissed Park's grievance.

In support of its motion to strike, CSU also provided a "faculty comparison document" prepared by Dr. LaPolt comparing the relative achievements of Park and other faculty members who were awarded tenure.

6

*2. Park's Opposition*

Park opposed CSU's motion to strike, arguing both that (1) CSU's decision to deny him tenure was a "governance decision" of a public entity and was therefore not protected by the anti-SLAPP statute; and (2) the "core injury-producing conduct by CSU" was its "failure to provide a fair tenure review procedure and hearing" and was therefore "not the protected speech" of CSU. In support of his opposition, Park filed a declaration in which he largely echoed the allegations made in his complaint. With respect to his achievements in publications (category B1), Park contended he "was only credited with having published two papers," but he "actually published four" - "two peer reviewed journal articles, one newsletter article, and one research report." Park claimed that all four should have been considered publications under CSU's policies. In addition to category B1, Park contended he had demonstrated achievement in categories B2 (college and community-based projects), B4 (presentations), and B5 (other contributions).

*3. Trial Court's Ruling*

The trial court issued its tentative ruling denying CSU's motion to strike on October 8, 2014. After distinguishing CSU's cited cases, the court found that "[t]his action is not expressly based on communicative acts in connection with the RTP and grievance processes." Thus, "the gravamen of the complaint was not defendant's communicative conduct in denying plaintiff tenure or his grievance," but rather "it was based on the act of denying plaintiff tenure based on national origin. Plaintiff could have omitted the allegations regarding communicative acts or filing a grievance and still state the same claims." The court further concluded that defendant failed to show "that the denial of tenure is an issue of public interest." Because it concluded that CSU had failed to meet its burden on the first prong of the anti-SLAPP analysis, the court did not reach the second prong analyzing whether Park could demonstrate a probability of prevailing

7

on the merits of his claims and did not rule on the related evidentiary objections to Park's declaration submitted by CSU. CSU timely appealed the denial of its motion to strike.[5]

## DISCUSSION

*A. Section 425.16 and Standard of Review*

"A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. '"While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right."' [Citations.]" (*Simpson Strong–Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 (*Simpson* ).)

"In 1992, out of concern over 'a disturbing increase' in these types of lawsuits, the Legislature enacted section 425.16, the anti-SLAPP statute. (§ 425.16, subd. (a).) The statute authorized the filing of a special motion to strike to expedite the early dismissal of these unmeritorious claims. (§ 425.16, subds.(b)(1), (f).) To encourage 'continued participation in matters of public significance' and to ensure 'that this participation should not be chilled through abuse of the judicial process,' the Legislature expressly provided that the anti-SLAPP statute 'shall be construed broadly.' (§ 425.16, subd. (a).)" (*Simpson, supra*, 49 Cal.4th at p. 21.)

Analysis of a motion to strike pursuant to section 425.16 involves a two-step process. (*Simpson, supra*, 49 Cal.4th at p. 21.) "First, the defendant must make a prima facie showing that the plaintiff's 'cause of action . . . aris[es] from' an act by the defendant 'in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue.' (§ 425.16, subd. (b)(1).) If a defendant meets this threshold showing, the cause of action shall be stricken unless the plaintiff can establish 'a probability that the plaintiff will prevail on the claim.' [*Ibid*.]" (*Simpson, supra*, 49 Cal.4th at p. 21, fn. omitted.) "Conversely, if the defendant does not meet its burden on

---

[5]    An order denying a section 425.16 motion is immediately appealable. (§ 425.16, subd. (i);§ 904.1, subd. (a)(13).)

8

the first step, the court should deny the motion and need not address the second step. [Citation.]" (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 266 (*Tuszynska*).)

We review an order denying an anti-SLAPP motion under a de novo standard. (*Tuszynska, supra,* 199 Cal.App.4th at p. 266.) In other words, we engage in the "same two-step process to determine, as a matter of law, whether the defendant met its initial burden of showing the action is a SLAPP, and if so, whether the plaintiff met its evidentiary burden on the second step." (*Id*. at p. 266-267, citation omitted.)

*B. Step One: Whether the Claims Arise From a Protected Activity*

    *1.     Protected Activity*

In the first step of a motion to strike under section 425.16, the moving party has the burden of showing that the cause of action arises from an act in furtherance of the right of free speech or petition—i.e., that it arises from a protected activity. (*Zamos v. Stroud* (2004) 32 Cal.4th 958, 965.) Thus, the moving party must establish both (1) that its act constituted protected activity; and (2) the cause of action arose from that protected activity.

The anti-SLAPP statute itself provides the parameters for protected activity. Section 425.16, subdivision (e) defines an "'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue'" as including: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; . . . (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

CSU contends its conduct falls within section 425.16, subdivisions (e)(1), (2), and (4). Specifically, with respect to subdivision (e)(2), CSU claims that its RTP proceedings qualify as an "official proceeding authorized by law" and that the reviews and evaluations given to Park during the RTP process are therefore covered as statements or

writings "made in connection with an issue under consideration or review" in the RTP proceedings. Neither Park nor the trial court appear to dispute this classification.[6] We agree that CSU's RTP proceedings qualify as official proceedings for the purpose of 425.16, subdivision (e)(2).[7]

In *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, (*Kibler*), the Supreme Court held that a hospital's peer review process qualified as an "'official proceeding authorized by law'" for the purposes of the anti-SLAPP statute, because the peer review process is governed by, and required under, the Business and Professions Code and decisions resulting from peer review proceedings are subject to judicial review by administrative mandamus. (*Id.* at pp. 198–200.) As such, "the Legislature has accorded a hospital's peer review decisions a status comparable to that of quasi-judicial public agencies whose decisions are likewise reviewable by administrative mandate." (*Id.* at p. 200, citing *McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785 (*McGill*).) In *McGill*, the Court of Appeal held that the state university's determination denying tenure to a faculty member was properly subject to judicial review by writ of ordinary mandate.[8] (*McGill, supra,* 44 Cal.App.4th at 1785.) In *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1396 (*Vergos*), the appellate court concluded that a grievance proceeding established by the Regents of the University of

---

[6] In its opening brief, CSU asserted that the trial court "declined" to make such a finding. While the trial court did not expressly find that CSU's RTP proceedings were covered by the anti-SLAPP statute, its order appears to assume as much and focuses on the issue of whether Park's claims arise from that protected conduct, concluding that "[d]efendant has cited no authority for the proposition that the act of denying tenure on a discriminatory basis is protected activity."

[7] We therefore do not consider whether the RTP proceedings qualify under 425.16, subdivisions (e)(1) or (e)(4).

[8] Ordinary mandate, as opposed to administrative mandate, "'is used to review adjudicatory actions or decisions when the agency was not required to hold an evidentiary hearing.'" (*Ibid.*) Here, it is undisputed that the RTP and associated grievance processes included a hearing. But the precise type of mandamus available to Park is irrelevant to our review.

10

California, a constitutional entity with quasi-judicial powers, was an official proceeding authorized by law under section 425.16.

Similarly here, the CSU Board is a public agency authorized and required by statute to adopt rules for governing university employees, including the RTP process. (See Education Code §§ 66600, 89000, 89500, subds. (a)(1) and (2), 89534, 89542.5.) CSU's adjudicatory decisions regarding tenure are subject to judicial review by petition for writ of mandate. (See *McGill, supra,* 44 Cal.App.4th at 1785; *Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1726.)

With respect to the alleged communicative conduct, the parties agree that the communications at issue here are the statements and written reviews made during the RTP process. As such, CSU has met its burden to establish that its statements made in connection with Park's RTP process qualify as protected conduct under section 425.16, subdivision (e)(2).

## 2. *"Arising From"*

Having established its qualifying communicative conduct, CSU must also show that Park's claims *arise out of* that protected activity. In considering whether a complaint arises from protected activity, "we disregard the labeling of the claim [citation] and instead "examine the principal thrust or gravamen of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies.""" (*Tuszynska, supra*, 199 Cal.App.4th at p. 267.) We assess the principal thrust by identifying "[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim." (*Martinez v. Metabolife Internat., Inc*. (2003) 113 Cal.App.4th 181, 189.) "If the core injury-producing conduct upon which the plaintiff's claim is premised does not rest on protected speech or petitioning activity, collateral or incidental allusions to protected activity will not trigger application of the anti-SLAPP statute. [Citation.]' [Citation]." (*Tuszynska*, *supra*, 199 Cal.App.4th at p. 267.) "[T]he critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.)

11

Park asserts that his causes of action are based on "CSU's conduct in denying Dr. Park's tenure based on national origin" and denies that his claims arise out of any communicative conduct by CSU. We agree that the gravamen of Park's complaint is CSU's decision to deny him tenure. The question then becomes whether that decision rests on protected activity.

We find a series of decisions in the hospital peer review context to be instructive on this issue. In *Nesson v. Northern Inyo County Local Hospital District* (2012) 204 Cal.App.4th 65, 73-74 (*Nesson*), overruled on other grounds by *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 686, fn. 18, a radiologist brought claims for breach of contract, discrimination, and retaliation against a hospital after its medical executive committee summarily suspended him and then terminated his contract. The hospital successfully moved to strike the complaint under section 425.16 and the Court of Appeal affirmed. (*Nesson, supra*, 204 Cal.App.4th at p. 81.) After finding, under *Kibler*, that the peer review proceedings constituted protected activity, the court held that the hospital's decision to terminate its contract with *Nesson* was based on the peer review findings and was a "necessary result" of that process. (*Ibid*.) Similarly, in *DeCambre v. Rady Children's Hospital-San Diego* (2015) 235 Cal.App.4th 1, the court applied the anti-SLAPP statute to a physician's claims for discrimination and wrongful termination, among others, holding that the "defendants showed that their decision not to renew DeCambre's contract stemmed from the protected peer review activity that began in 2009. This showing is sufficient to satisfy the first prong of the anti-SLAPP analysis." (*Id*. at p. 22.)

Our sister courts of appeal have reached similar conclusions regarding employment decisions outside the peer review context, where the decision was predicated on the protected activity. For example, in *Tuszynska, supra*, 199 Cal.App.4th at p. 261, an attorney who provided legal services to members of a sheriffs' association under a prepaid legal services plan brought an action for discrimination contending that she received fewer case assignments because of her gender. Defendants argued that her claims arose from protected "communications made in determining what attorneys should

12

be selected to represent [association] members, and whether and to what extent" the plan should fund litigation. (*Id*. at p. 264.) Plaintiff argued, and the trial court agreed, that her claims were based on "defendants' alleged 'conduct' in failing to refer cases to her, rather than 'communications' defendants made." (*Id*. at p. 265.) The Court of Appeal reversed, finding that the anti-SLAPP statute applied because plaintiff's gender discrimination claims were "based squarely on defendants' attorney selection and litigation funding decisions themselves, and, concomitantly, communications defendants made in connection with making those decisions." (*Id*. at p. 269; see also *Vergos*, *supra*, 146 Cal.App.4th at p. 1397 [finding the gravamen of the plaintiff's complaint was defendant's "communicative conduct in denying plaintiff's grievances. The hearing, processing, and deciding of the grievances (as alleged in the complaint) are meaningless without a communication of the adverse results."].)

Here, the gravamen of Park's complaint—CSU's decision to deny him tenure—is entirely based on the evaluations of his performance and competency during the RTP proceedings. Park has provided no basis for his claims of discrimination outside of the RTP process, which culminated in his termination. (See *Nesson*, *supra*, 204 Cal.App.4th at p. 84 ["*Nesson* fails to cite any evidence of retaliation or discrimination which is not connected with his summary suspension."].) As such, his claims are based squarely on CSU's tenure and termination decisions, "and concomitantly, communications [CSU] made in connection with making those decisions." (*Tuszynska*, *supra*, 199 Cal.App.4th at p. 269.)

A crucial distinction is therefore whether the protected speech at issue was central, or merely incidental, to the alleged injury. The court in *DeCambre* relied on this distinction in holding that some of the plaintiff's claims (for discrimination and wrongful termination) arose from protected peer review activity and were therefore covered under the anti-SLAPP statute, while others were not, as those causes of action (for harassment, intentional infliction of emotional distress, and defamation) arose from incidents of mistreatment that allegedly occurred throughout plaintiff's employment rather than from the peer review process and termination decision. (*DeCambre, supra*, 235 Cal.App.4th at

13

p. 17-18.)  Similarly, in *Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 624-625, the court found the employee's claims for discrimination and retaliation, among others, against his former employer were not based on protected activity. Although the complaint contained some references to protected activity—namely, poor performance reviews and a discussion of plaintiff's performance during a board meeting—those references were "minimal."  Instead, the focus of plaintiff's claims was the harassing and retaliatory acts by plaintiff's supervisor, none of which was protected under section 425.16.  (*Ibid*.)  Here, by contrast, Park's claims are squarely premised on the decision to deny him tenure, rather than any alleged discriminatory conduct outside of that process.  Moreover, *all* of the communications at issue reflected evaluations of Park's performance and potential for promotion; these performance reviews then formed the fundamental basis for the challenged decision to deny tenure to Park.  (See *Nesson*, *supra*, 204 Cal.App.4th at p. 84.)  We need not decide whether all speech related to the RTP process would be similarly protected, as Park's claims implicate only those statements central to the tenure decision.

Tellingly, Park ignored *Nesson* and *DeCambre* in his opposition to CSU's motion to strike and on appeal.  Instead, he attempts to circumvent the authority discussed above by arguing that the gravamen of his complaint is not the tenure decision, but rather "CSU's failure to provide a fair tenure review procedure and hearing."[9]  First, that claim belies Park's own complaint, which challenges the substance of  CSU's decision to deny him tenure, rather than the fairness of the RTP process.  Moreover, as discussed above, the appropriate vehicle for a challenge to the procedures followed in the RTP process would have been a petition for writ of mandate.  Park failed to pursue that option.  His cited cases on this issue, all declining to apply the anti-SLAPP statute in the context of mandamus actions, are thus inapplicable to the factual circumstances here.  (See *Young v. Tri-City Healthcare District* (2012) 210 Cal.App.4th 35, 57 [doctor's statutory right to

_____

[9]     Park's brief on appeal actually asserts both bases—first, that his complaint is based on CSU's decision to deny tenure and then that it is based on the lack of a fair hearing.

14

seek judicial review of administrative order of suspension did not implicate section 425.16, as "distinguished from requests for damages that are fundamentally based on alleged injury arising from such peer review activity"]; *San Ramon Valley Fire Protection Dist. v. Contra Costa County Employees' Retirement Assn*. (2004) 125 Cal.App.4th 343, 354 ["Acts of governance mandated by law, without more, are not exercises of free speech or petition."]; *Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207 [action seeking writ of mandate and declaratory relief not based on communications by the city, but rather "on state and municipal laws requiring the City to award certain contracts through competitive bidding"].)

Park also argues that his claims do not trigger the anti-SLAPP statute because CSU's conduct in denying him tenure was discriminatory and therefore could not be protected. But Park confuses conduct with motive. When evaluating whether the defendant has carried its burden under the first prong of the anti-SLAPP statute, "courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. '[C]auses of action do not arise from motives; they arise from acts.' [Citation.]" (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809, 823, citing *Tuszynska*, *supra*, 199 Cal.App.4th at p. 269.) The allegation that CSU's conduct was discriminatory is not relevant to our analysis under the first prong of the anti-SLAPP statute. (See *Tuszynska*, *supra*, 199 Cal.App.4th at p. 269 [cautioning against conflating "defendants' alleged injury-producing conduct— their failure to assign new cases to plaintiff and their refusal to continue funding cases previously assigned to her—with the unlawful, gender-based discriminatory motive plaintiff was ascribing to defendants' conduct—that plaintiff was not receiving new assignments or continued funding because she was a woman"] emphasis in original.) "This type of distinction is untenable in the anti-SLAPP context because it is at odds with the language and purpose of the anti-SLAPP statute. The statute applies to claims 'based on' or 'arising from' statements or writings made in connection with protected speech or petitioning activities, regardless of any motive the defendant may have had in

15

undertaking its activities, or the motive the plaintiff may be ascribing to the defendant's activities." (*Id*. at pp. 268-269.)[10]

In sum, we conclude that CSU met its burden on the first step of its anti-SLAPP motion to strike. Because the trial court reached the contrary conclusion, it did not address whether Park met his burden to demonstrate a probability of prevailing on his claims, nor did it consider the admissibility of the parties' evidence. We therefore remand the matter so that the trial court can decide this issue in the first instance. (See, e.g., *Tuszynska*, *supra*, 199 Cal.App.4th at p. 267 [remanding for consideration of second prong]; *Hunter, supra,* 221 Cal.App.4th at p. 1519 [same].)

## DISPOSITION

The order denying CSU's motion to strike pursuant to section 425.16 is reversed. The matter is remanded to the trial court with directions to determine whether Park met his burden under the second prong of the anti-SLAPP analysis. The parties are to bear their own costs on appeal.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

I concur:

MANELLA, J.

---

[10] Of course, this does not mean that discriminatory conduct is completely protected under the statute. Instead, CSU's motive becomes relevant under the second prong, where Park must demonstrate a reasonable probability of prevailing on the merits of his claims. (See *Hunter v. CBS Broadcasting Inc*. (2013) 221 Cal.App.4th 1510, 1525-1526 (*Hunter*) ["'[t]he Legislature's inclusion of a merits prong to the statutory SLAPP definition (§425.16, subd. (b)(1)) . . . preserves appropriate remedies for [causes of action based on protected activity] by ensuring that claims with the requisite minimal merit may proceed.' (*Navellier* [(2002)] 29 Cal.4th [82,] 94)."].)

16

**EPSTEIN, P.J.**

I respectfully dissent.

My colleagues would construe the anti-SLAPP statute as applying whenever the action of the defendant under attack in a lawsuit is informed by protected free speech activity. It is difficult to conceive of any collective governmental action that is not; certainly the peer review process in tenure decisions involves protected communications by faculty and academic administrators. But "the mere fact an action was filed after protected activity took place does not mean it arose from that activity." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 66 (*Equilon*).) The tenure decision involves a process that necessarily requires communications and, in this case, formal written evaluations of the academic candidate. But reviewing courts must be careful not to conflate the process by which a decision is made with the ultimate governmental action itself. As discussed in *Equilon*, "'"the act underlying the plaintiff's cause" or "the act which forms the basis for the plaintiff's cause of action" must *itself* have been an act in furtherance of the right of petition or free speech.'" (*Equilon*, quoting *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1003.) In this case, that act was the decision to deny tenure to Professor Park. While the process which led to it may be protected by various privileges and immunities, the act itself is not a basis for application of the anti-SLAPP statute.[1]

---

[1] I recognize that in applying the anti-SLAPP statute in the analogous context of a hospital staff termination proceeding, *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65, 83, the court stated that the hospital based its decision on letters and a report from a hospital committee, and these "are part of the peer review process." To the degree this is a holding that the hospital decision itself arises from such communications is sufficient to invoke the statute, I disagree.